FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA
ex rel. NANCY SANDER and SANDRA
FUSCO-WALKER
and STATE OF FLORIDA
ex rel. NANCY SANDER and SANDRA
FUSCO-WALKER
and STATE OF CALIFORNIA
ex rel. NANCY SANDER and
SANDRA FUSCO-WALKER
and STATE OF MASSACHUSETTS
ex rel. NANCY SANDER and
SANDRA FUSCO-WALKER
and STATE OF TEXAS
ex rel. NANCY SANDER and
SANDRA FUSCO-WALKER
and STATE OF ILLINOIS
ex rel. NANCY SANDER and
 SANDRA FUSCO-WALKER

      Plaintiffs

v.

ROTECH HEALTHCARE, INC. and
PULMO-DOSE, INC.

      Defendants.

Civil Action No.

8:06-CV-01739-T-27TBM

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)**

## FALSE CLAIMS ACT COMPLAINT

### Introduction

1.    NANCY SANDER and SANDRA FUSCO-WALKER ("Relators") bring this action

on behalf of the UNITED STATES OF AMERICA against ROTECH HEALTHCARE, INC. and

PULMO-DOSE, INC. for treble damages and civil penalties arising from DEFENDANTS' conduct

in violation of the Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA").  The violations arise



out of requests for payment by Medicare, Medicaid, TRICARE, and other federally-funded government healthcare programs (hereinafter, collectively referred to as "Government Healthcare Programs").

2.      This action is also brought on behalf of the STATE OF FLORIDA (pursuant to The Florida False Claims Act, FLA.  STAT. §§68.081 - 68.092); The STATE OF CALIFORNIA (pursuant to The California False Claims Act, CAL.  GOV.  CODE §§12650-12655); the STATE OF TEXAS (pursuant to The Texas Medicaid Fraud Prevention Law, TEX.  HUM. RES. CODE §§36.001 - .132); The STATE OF ILLINOIS (pursuant to The Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1-8); and the STATE OF MASSACHUSETTS (pursuant to The Massachusetts False Claims Act, G.L. c.12, sec.  5A-50).

3.      The facts and circumstances alleged hereinafter involve a deceitful, systematic and very successful scheme which has resulted in the fleecing of Government Healthcare Programs and the delivery of unnecessarily sub-standard medication to Medicare and other Government Healthcare Program beneficiaries. This lawsuit involves false claims submitted for a class of medications utilized in a nebulizer -- aqueous based drugs for inhalation. While there are numerous safe and effective inhalation drugs that have been approved by the Food and Drug Administration ("FDA")[1] for use in a nebulizer, mass manufacturing operations (under the guise of compounding) such as the DEFENDANTS have been dispensing substitute formulations typically containing the same active ingredients, and then submitting claims to Medicare, Medicaid, TRICARE and other federal government funded healthcare programs (hereinafter referred to as "Government Healthcare

---

[1]All of the inhalation drugs approved by FDA are formulated in aqueous-based liquids. The aqueous-based drugs for inhalation approved by FDA are limited to the following active ingredients: albuterol sulfate, cromolyn sodium, levalbuterol hydrochloride, ipatropium bromide, albuterol/ipatropium, terbutaline sulfate, acetylcysteine, budesonide, metaproterenol sulfate, and tobramycin sulfate.

2

Programs").

4.      Federal law, including the Centers for Medicare and Medicaid Services (CMS) guidelines and the regulations of other Government Healthcare Programs, prohibit coverage of claims for "compounded" medications when the claims are submitted by a company that is mass manufacturing large amounts of unapproved drugs in violation of the Federal Food, Drug and Cosmetic Act ("FDCA"), under the guise of "compounding." It is the false claims for such mass manufactured drugs in violation of the FDCA that is the subject of this lawsuit.

5.      As required by the FCA, 31 U.S.C. § 3730(a)(2), the Relators have provided to the Attorney General of the United States and to the United States Attorney for the Middle District of Florida, simultaneous and/or prior to the filing of this Complaint, a statement of all material evidence and information related to the Complaint.  This disclosure statement is supported by material evidence known to Relators at the time of their filing, establishing the existence of DEFENDANTS' legal responsibility for those false claims.  Because the statement includes attorney-client communications and work product of Relators' attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relators understand this disclosure to be confidential.

6.      As may be required by the Florida False Claims Act, the California False Claims Act, the Texas Medicaid Fraud Prevention Act, the Illinois Whistleblower Reward and Protection Act, and the Massachusetts False Claims Act, the Relators have provided to the appropriate officials of each state, simultaneous with the filing of this Complaint, a statement of all material evidence and information ("Disclosure Statement") related to this Complaint, as applicable.  This "Disclosure Statement" is supported by material evidence known to Relators at the time of the filing of this

3

Complaint, establishing the existence of Defendants' false claims.  Because this Disclosure

Statement includes attorney-client communications and work product of Relators' attorneys, and is

submitted to various state agencies in their capacity as potential co-counsel in the litigation, the

Relators understand this disclosure to be confidential.

### Federal Jurisdiction and Venue

7.    The acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein occurred

in part in the Middle District of Florida, and DEFENDANTS do business in the Middle District of

Florida.  Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. 3732 (a), as well

as under 28 U.S.C. § 1345.  This Court has pendent jurisdiction over this case for the claims brought

on behalf of the states (referenced in paragraph 2) pursuant to 31 U.S.C. §3732(b), inasmuch as

recovery is sought on behalf of said states which arises from the same transactions and occurrences

as the claim brought on behalf of the United States.

8.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because

DEFENDANTS transact business in this District.

### Parties

9.    Relators bring this action based on their direct knowledge and also on information

and belief.  None of the actionable allegations set forth in this Complaint are based on a public

disclosure as set forth in 31 U.S.C. §3730(e)(4).  Notwithstanding same, Relators are an original

source of the facts alleged in this Complaint.

10.    At all times relevant hereto, DEFENDANTS acted through their agents and

employees and the acts of DEFENDANTS' agents and employees were within the scope of their

agency and employment. The policies and practices alleged in this complaint were, on information

and belief, set or ratified at the highest corporate levels of DEFENDANTS.

### Information about the Relators and the Defendants

11.     Relator, NANCY SANDER, is a resident of the State of Virginia and is the founder and current President of Asthma & Allergy Network Mothers of Asthmatics ("AANMA").[2]

12.     Relator, SANDRA FUSCO-WALKER is a resident of the State of New Jersey and is the Director of Government Affairs for AANMA.

13.     Defendant ROTECH HEALTHCARE, INC. is a Delaware Corporation with its principal place of business located at 2600 Technology Drive, Suite 300, Orlando, FL 32804. It holds itself out to the public as a "leading provider of home respiratory care and durable medical equipment and services to patients with breathing disorders such as chronic obstructive pulmonary diseases (COPD) [that] ... provides its equipment and services in 48 states through approximately 485 operating centers, located principally in non-urban markets."

14.     In February 2002, Rotech Medical Corporation paid the United States $17 million to resolve allegations that the company fraudulently overbilled government healthcare programs for respiratory equipment, supplies and services.

15.     The allegations included the submission of forged and falsified documents used in billing the government for durable medical equipment such as oxygen cylinders, oxygen concentrators, and nebulizers; double billing; claims for undelivered items; claims for medically unnecessary drugs and equipment; claims for treating deceased patients; and claims that were

---

[2]     AANMA is a national membership organization dedicated to eliminating suffering and death due to asthma, allergies, and related conditions through education, advocacy, community outreach, and research.

5

arbitrarily inflated based upon a relative lack of competition.

16.    ROTECH also entered into a comprehensive five year Corporate Integrity Agreement, fully knowing that the United States designated "coverage rules and criteria," and "medical necessity," as specific risk areas.

17.    Defendant, PULMO-DOSE, INC. is a Florida Corporation and subsidiary of Defendant ROTECH HEALTHCARE, INC., with its principal place of business located in the State of Kentucky.

18.    Both DEFENDANTS are integrally involved with the false claims described hereinafter and shall  collectively be referred to as  "ROTECH."

### Food, Drug & Cosmetic Act

19.    The Food, Drug and Cosmetic Act prohibits the sale of unapproved new drugs in interstate commerce: "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application [to the FDA] is effective with respect to such drug."21 U.S.C. § 355(a).  A drug manufacturer or distributor obtains FDA approval by submitting a new drug application (NDA) or abbreviated new drug application (ANDA)[3] in accordance with the statute and FDA regulations. See 21 U.S.C. § 355(b)-(b)(1); 21 C.F.R. § 314.50 (detailing contents of NDA).

20.    The United States enforces the FDCA by, among other things[4] , seeking injunctive

---

[3] An alternative to the NDA is available for generic drugs. A generic version of an approved pioneer drug may obtain FDA approval by filing an ANDA. 21 U.S.C. § 355(j).

[4] Companies that sell non-FDA-approved drugs are also subject to at least the following federal criminal statutes: (1) Introducing a new drug not approved by the FDA into interstate commerce with the intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(d), 333(a)(2); (2) Introducing a misbranded drug into interstate commerce with the intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(a), 333(a)(2).  In addition, most states have enacted laws which

relief against manufacturers and distributors which violate its terms. See 21 U.S.C. § 332(a).

21.   Compounding has been defined by the United States Supreme Court as:

> Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient. Compounding is typically used to prepare medications that are not commercially available, such as medication for a patient who is allergic to an ingredient in a mass-produced product. It is a traditional component of the practice of pharmacy, ... and is taught as part of the standard curriculum at most pharmacy schools, ...Many States specifically regulate compounding practices as part of their regulation of pharmacies. (internal citations omitted).

Thompson v. Western States Medical Center, 535 U.S. 357,361 (2002).

22.   In 1992, consistent with its longstanding policies regarding traditional compounding, FDA issued a Compliance Policy Guide ("CPG") for human drug compounding. See CPG § 460.200, previously numbered 7132.16; 57 Fed. Reg. 10906 (Mar. 31, 1992).

23.   The CPG explained that the agency's enforcement priority regarding human drug compounding was to focus on establishments engaged in manufacturing unapproved new human drugs under the guise of traditional pharmacy compounding.

24.   CPG § 460.200 was reissued in 2002 to explain how the FDA intends to address pharmacy compounding of human drugs as a result of the decision of the Supreme Court in Thompson v. Western States Medical Center, No. 01-344, April 28, 2002. In brief, the CPG explained that "when the scope and nature of a pharmacy's activities raise the kinds of concerns normally associated with a drug manufacturer and result in significant violations of the new drug, adulteration, or misbranding provisions of the Act, FDA has determined that it should seriously

---

also criminalize the sale of non-FDA approved drugs, not otherwise exempted.

consider enforcement action."

25.     In recent years, responding to an ever-growing problem, the FDA has issued multiple warning letters against pharmacies that have been mass manufacturing drugs (under the guise of "compounding") in violation of the FDCA. In addition, the FDA, together with the Department of Justice, have pursued criminal and civil prosecutions against entities and individuals involved in harmful mass-manufacturing of "compounded" drugs.

## Medicare

### Coverage of Drug Products

26.     In 1965, Congress enacted Title XVIII of the Social Security Act (known as "Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care. Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. §1395 to 1395 ccc. Generally, Part B and Part D of the Medicare Program are at issue here.

27.     Under Part B, eligible persons may enroll to obtain benefits, such as physician services, durable medical equipment, and certain pharmaceuticals. 42 U.S.C. § 1395k(a)(2)(B). As a general rule, Part B does not cover the cost of prescription pharmaceuticals that a Medicare beneficiary obtains pursuant to a prescription and thereafter self-administers (e.g., by swallowing the drug in liquid or pill form).

28.     Despite the general limitation on coverage for outpatient drugs under Part B, the law specifically authorizes coverage for drugs that require administration by the use of a piece of covered durable medical equipment ("DME") (e.g., a nebulizer, external or implantable pump). The statute does not explicitly cover DME drugs; they are covered as a supply necessary for the DME to perform its function. The largest Medicare expenditures for drugs furnished as a DME supply are for

8

inhalation drugs, which are administered through the use of a nebulizer (e.g., albuterol sulfate, ipatropium bromide).

29.     For Part D, a covered drug is available only by prescription, approved by the Food and Drug Administration (FDA) (or is a drug described under section 1927(k)(2)(A)(ii) or (iii) of the Act), used and sold in the United States, and used for a medically accepted indication (as defined in section 1927(k)(6) of the Act). A covered Part D drug includes prescription drugs, biological products, insulin as described in specified paragraphs of section 1927(k) of the Act, and vaccines licensed under section 351 of the Public Health Service Act. The definition of a covered Part D drug excludes any drug for which payments would be available under Parts A or B.

**Prohibition of Coverage for Mass Produced Compounded Drugs**

30.     Medicare Benefits Policy Carriers Manual Section 50.4.7[5] instructs Carriers to deny coverage for the claims of pharmacies engaged in mass production of compounded drugs.   It provides:

> 50.4.7 - Denial of Medicare Payment for Compounded Drugs Produced in Violation of Federal Food, Drug, and Cosmetic Act (Rev. 1, 10-01-03)
> B3-2049.4.C.6
>
> The Food and Drug Administration (FDA) has found that, from time to time, firms established as retail pharmacies engage in mass production of compounded drugs, beyond the normal scope of pharmaceutical practice, in violation of the Federal Food, Drug, and Cosmetic Act (FFDCA). By compounding drugs on a large scale, a company may be operating as a drug manufacturer within the meaning of the FFDCA, without complying with requirements of that law. Such companies may be manufacturing drugs which are subject to the new drug application (NDA) requirements of the FFDCA, but for which FDA has not approved an NDA or which are misbranded

---

[5]Formerly in Carrier Publication 14 B3 - 2049.4 C6.

9

or adulterated. If the FDA has not approved the manufacturing and processing procedures used by these facilities, the FDA has no assurance that the drugs these companies are producing are safe and effective. The safety and effectiveness issues pertain to such factors as chemical stability, purity, strength, bioequivalency, and biovailability.

Section 1862(a)(1)(A) of the Act requires that drugs must be reasonable and necessary in order to by covered under Medicare. This means, in the case of drugs, the FDA must approve them for marketing. Section 50.4.1 instructs carriers and intermediaries to deny coverage for drugs that have not received final marketing approval by the FDA, unless instructed otherwise by CMS. The Medicare Benefit Policy Manual, Chapter 16, "General Exclusions from Coverage," §180, instructs carriers to deny coverage of services related to the use of noncovered drugs as well. Hence, if DME or a prosthetic device is used to administer a noncovered drug, coverage is denied for both the nonapproved drug and the DME or prosthetic device.

In those cases in which the FDA has determined that a company is producing compounded drugs in violation of the FFDCA, Medicare does not pay for the drugs because they do not meet the FDA approval requirements of the Medicare program. In addition, Medicare does not pay for the DME or prosthetic device used to administer such a drug if FDA determines that a required NDA has not been approved or that the drug is misbranded or adulterated.

The CMS will notify the carrier when the FDA has determined that compounded drugs are being produced in violation of the FFDCA. The carrier does not stop Medicare payment for such a drug unless it is notified that it is appropriate to do so through a subsequent instruction. In addition, if the carrier or Regional Offices (ROs) become aware that other companies are possibly operating in violation of the FFDCA, the carrier or RO notifies:

Centers for Medicare & Medicaid Services
Center for Medicare Management
7500 Security Blvd.
Baltimore, MD 21244-1850


31.    The Carriers Manual relies on Section 1862 (U.S.C. 1395y) of the Social Security

Act, which states that no payment may be made under Part A or Part B for any items and services

10

which are not "reasonable and necessary." In order for an item or service to considered by Medicare to be reasonable and necessary (medically necessary) the item or service must (among other requirements)have been prescribed by a licensed physician. If the item prescribed is a prescription drug, the drug furnished must not only be the drug ordered by the physician but that drug must have been approved by the FDA as safe and effective ("reasonable" in the case of drugs, includes FDA approval).

32.    The Carriers Manual states the basic payment requirements for compounded drugs. When the section cites that "By compounding drugs on a large scale, a company may be operating as a drug manufacturer within the meaning of the Federal Food and Drug Act (FFDA), without complying with the requirements of that law," CMS is not indicating that such large scale compounding "MAY" be acceptable. Rather, it is not acceptable.

33.    The rationale for not paying for either the drug or the inhalation device used to administer the unapproved drug is clearly stated in the first paragraph of section 2049.4(E), i.e., ". . . no assurance that the drugs …are safe and effective. The safety and effectiveness issues pertain to such factors as chemical stability, purity, strength, bioequivalency, and bioavailability.

34.    Not to be understated is the requirement that the drug must have been determined by the prescribing physician as medically necessary for the treatment of his or her patient. Consequently, by definition, the unauthorized substitution of a compound/mix for the prescription drug ordered negates the medical necessity of the unauthorized compound/mix. Such is also the case, if the physician is "duped" into ordering an unintended drug. The guiding principle is always that the physician is the sole determiner of the drug being supplied and any action by the supplier that defeats that physician's prerogative also negates the medical necessity of that drug.

11

## Substantive Allegations

35.   The companies that comprise ROTECH provide, inter alia, oxygen and other respiratory therapy services, including "compounded" medications.   ROTECH is able to gain patients in multiple ways, including from the patient herself, a physician, hospital discharge planner, or other source.

36.   ROTECH patients identified in this case were at the mercy of ROTECH; they were sick, and many were too feeble to direct their own care or make medication choices.  They and their family care givers had no reason to doubt that ROTECH would, without their informed consent, replace their FDA-approved nebulizer medications with unapproved, unlawfully mass manufactured medications.

37.   Elderly, frail and sick patients were targeted because they were vulnerable to the attention and persuasion of ROTECH 's sales representatives.

38.   Patients and physicians are generally not aware that compounded medications are not FDA-approved.  Unless ROTECH "prescription forms" made it clear to physicians and patients that the "ROTECH Brand" is not an FDA-approved generic, it is not manufactured in an FDA-licensed facility, that it may or may not contain active ingredients or the right amount of active ingredient, that the active ingredient may or may not be sterile or manufactured sterile, may contain known airway irritants such as ethanol or benzalkonium chloride, physicians and their patients had no way of find out this information on their own.

39.   ROTECH secures authorization to substitute prescriptions through carefully scripted sales contact with patients and their physicians while omitting critical material facts outlined above.

40.   Traditional compounding is a triad, physician, patient and pharmacist, all working

12

together and understanding risks of unapproved medications. In the ROTECH cases, only ROTECH knows the "approval" status of the medication the patient receives. Absence of material facts leaves patients and prescribers vulnerable to health and liability complications over which they have no control.

41.    Unlike legitimate compounding pharmacies, ROTECH dispensed compounds by obtaining prescriptions from physicians by misleading them and their patients. ROTECH deceived physicians into believing that they were ordering FDA-approved drugs yet their patients were receiving mass manufactured compounded drugs.

42.    In order to increase their revenues, ROTECH has designed its order forms to make it difficult, if not virtually impossible, for a physician to order a drug that is not compounded.

43.    Unlike legitimate compounding pharmacies, ROTECH dispensed compound prescriptions in strengths and delivery forms that were the same or substantially the same as commercially available drugs. There is no medical justification for prescribing or dispensing a compounded medicine that is the same or similar to a commercially available medicine.

44.    Unlike legitimate compounding pharmacies, ROTECH dispensed compound prescriptions without any documentation of the medical need for the particular variation of the drug (from the commercially available drug) for the particular patient.

45.    On or about August 9, 2006, the FDA issued Warning Letter No. 06-27353-15 to ROTECH HEALTHCARE, INC. It states, in pertinent part:

> Based on our inspection, we have determined that Pulmo-Dose's operation exceeds the scope of the practice of pharmacy. Our findings indicate that Pulmo-Dose is operating as a pharmaceutical manufacturer and not a pharmacy engaged in extemporaneous compounding. Relevant findings include:
> Pulmo-Dose manufactures budesonide inhalation products in 0.4 mg

13

(1.5 ml vial) and 0.3 mg (1.5 ml vial). However, there is an FDA-approved, commercially available budesonide product (Pulmicort) available in strengths of 0.5 mg and 0.25 mg. We are not aware of any legitimate medical need for these insignificant differences in formulation. Moreover, this concern is especially true given the large numbers of these drugs that you produce, as described below.

Pulmo-Dose manufactures albuterol 2.5 mg/ipratropium 0.5 mg in 3 ml vials, which is essentially a copy of the commercially available product, DuoNeb. The only noteworthy difference is that Pulmo-Dose's version contains the preservative benzalkonium chloride, and DuoNeb contains edentate disodium. The prescriptions for this product do not specifically call for that particular variation. In addition, your files do not document patient-specific medical need for the variation from the approved product. Thus, there is no demonstration of medical necessity for these compounded products. During the first six months of 2005, Pulmo-Dose manufactured and dispensed over [redacted] vials of various inhalation drug products, including over [redacted] vials of budesonide 0.4 mg and over [redacted] vials of formoterol 12 mcg/budesonide 0.5 mg.

* * *

Section 505(a) (21 U.S.C. § 355(a))

The inhalation solutions manufactured by Pulmo-Dose are drugs within the meaning of Section 201(g) of the Act (21 U.S.C. § 321(g)). They are also new drugs within the meaning of Section 201(p) of the Act (21 U.S.C. § 321(p)), and may not be introduced or delivered for introduction into interstate commerce under Section 505(a) of the Act (21 U.S.C. § 355(a)) because no approval of an application filed pursuant to Section 505(b) or (j) of the Act (21 U.S.C. § 355(b), (j)) is in effect for such drugs.

46.    ROTECH knowingly manufactured compounded drugs in such quantity so as to render them "New Drugs" under the FFDCA, in violation of the FFDCA, and therefore not a covered benefit under the Medicare program. Medicare Benefits Policy Carrier Manual Section 504.7 prohibits coverage of ROTECH's claims for mass produced drugs under the guise that they were legitimately compounded and dispensed. In addition, Medicare Carriers Manual Section 2049.4 (and its successor or predecessor, if any) prohibits coverage of ROTECH's claims for mass manufactured drugs because Section 2049.4 instructs Carriers to deny coverage for drugs that have not received

14

final marketing approval by the FDA, unless otherwise instructed by CMS.

47.     All DME claims associated with the nebulizer equipment are also non-covered and false claims.

48.     ROTECH, by way of example submitted false claims for non FDA-approved drugs furnished to an 81 year old female Medicare patient with bronchiectasis and possible asthma and a history of frequent pneumonia. She was not even able to participate in pulmonary function testing because of the level of fatigue that she was experiencing. When seen by Dr. L.S., she was unknowingly using a budesonide and formoterol combination medication. Dr. L.S. ordered FDA-approved Advair for her instead as she has been on in the past. The 81 year old female unknowingly began receiving the compounded medication when she had received a free nebulizer to use with the DuoNeb she was also on.

49.     If patients and prescribers and knew the material facts, they wouldn't have used the mass produced ROTECH medications.   There would be no medical benefit of using mass manufactured nebulizer medications.   The risks are simply too great.

50.     ROTECH's actions deny patients the right to govern or direct their own healthcare choices with their physicians; violate the patient/physician relationship; violate the physician's ability to structure and monitor the progress of the patient; and denies the patient opportunity to achieve stated treatment goals.

**The Federal False Claims Act**

51.     The Federal FCA provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false

or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

## COUNT I- FEDERAL FALSE CLAIMS ACT

52.     Relators reallege and incorporate by reference paragraphs 1 - 51 as though fully set forth herein.

53.     This is a claim by Relators, on behalf of The UNITED STATES OF AMERICA, for treble damages and penalties under the FCA, 31 U.S.C. 3729-3733 against DEFENDANTS for knowingly presenting and/or causing to be presented false claims to Government Healthcare Programs.  From on or about six years preceding the filing of this complaint through present, in the Middle District of Florida and elsewhere throughout the United States, DEFENDANTS have knowingly and willfully presented and caused to be presented false claims.

54.     DEFENDANTS have presented and caused to be presented claims for payment to the Government Programs, knowing such claims were false.

55.     Pursuant to 31 U.S.C. §3729(a)(1) and 31 U.S.C. §3729(a)(2), DEFENDANTS have knowingly presented and caused to be presented CMS-1500, and other claim forms for payment for mass manufactured "compounded" drugs, knowing that such false claims would be submitted to Government Healthcare Programs for reimbursement, and knowing that such Government Healthcare Programs were unaware that they were reimbursing prescriptions for non-covered drugs

16

and therefore false claims.

56.     By virtue of the false claims that DEFENDANTS presented and/or caused to be presented and presented for the drugs, the UNITED STATES OF AMERICA is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim presented or caused to be presented.

57.     As a result of DEFENDANTS' conduct, the UNITED STATES OF AMERICA has been damaged in the millions of dollars, in violation of the False Claims Act, 31 U.S.C. §3729 et. seq.

WHEREFORE, Relators respectfully request this Court enter judgment against DEFENDANTS as follows:

(a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides.
(b)     That civil penalties of $11,000 be imposed for each and every false claim that DEFENDANTS caused to be presented to the Government Healthcare Programs under the Federal False Claims Act.
(c)     That pre- and post-judgment interest be awarded, along with reasonable attorney's fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;
(d)     That the Relators be awarded the maximum amount allowed pursuant the Federal False Claims Act.
(e)     That this Court award such other and further relief as it deems proper.

## COUNT II
## ILLINOIS WHISTLEBLOWER REWARD & PROTECTION ACT

58.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 51 above as if fully set forth herein.

59.     This is a *qui tam* action brought by RELATORS on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection

17

Act, 740 ILCS 175 *et seq.*

60.     740 ILCS 175/3(a) provides liability for any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;
(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
(3)     conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

61.     DEFENDANTS violated 740 ILCS 175/3(a) and knowingly presented and caused to be presented hundreds of thousands of false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws, including the FDCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

62.     ROTECH may also have identified the compounded drugs on their Medicaid claims by using NDC numbers for brand name drugs. (Unlike Medicare, Medicaid requires identification of drugs by their NDCs).

63.     The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of DEFENDANTS' conduct, paid the claims.

64.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with DEFENDANTS' conduct. Compliance with applicable Illinois statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Illinois.

65.     Had the State of Illinois known that DEFENDANTS were violating the federal and

18

state laws cited herein and/or that the claims submitted in connection with DEFENDANTS' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by DEFENDANTS in connection with that conduct.

66.     As a result of DEFENDANTS' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

67.     Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

68.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, RELATORS respectfully request this Court to award the following damages to the following parties and against DEFENDANTS:

To the STATE OF ILLINOIS:

(1)     Three times the amount of actual damages which the State of Illinois has sustained as a result of DEFENDANTS' conduct;
(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which DEFENDANTS caused to be presented to the State of Illinois;
(3)     Prejudgment interest; and
(4)     All costs incurred in bringing this action.

To RELATORS:

(1)     The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;
(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT III
## CALIFORNIA FALSE CLAIMS ACT

69.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 51

above as if fully set forth herein.

70.     This is a *qui tam* action brought by RELATORS on behalf of the State of California

to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't.

Code § 12650 *et seq.*

71.     Cal. Gov't Code § 12651(a) provides liability for any person who

> (1) knowingly presents, or causes to be presented, to an officer or
> employee of the state or of any political division thereof, a false claim
> for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used a false
> record or statement to get a false claim paid or approved by the state
> or by any political subdivision;
> (3) conspires to defraud the state or any political subdivision by
> getting a false claim allowed or paid by the state or by any political
> subdivision.
> (4) is a beneficiary of an inadvertent submission of a false claim to
> the state or a political subdivision, subsequently discovers the falsity
> of the claim, and fails to disclose the false claim to the state or the
> political subdivision within a reasonable time after discovery of the
> false claim.

72.     DEFENDANTS violated Cal. Gov't Code § 12651(a) and knowingly presented

and/or caused hundreds of thousands of false claims to be made, used and presented to the State of

California by its deliberate and systematic violation of federal and state laws, including the FDCA,

and by virtue of the fact that none of the claims submitted in connection with its conduct were even

eligible for reimbursement by the government funded healthcare programs.

73.     ROTECH may also have identified the compounded drugs on their Medicaid claims

20

by using NDC numbers for brand name drugs. (Unlike Medicare, Medicaid requires identification of drugs by their NDCs).

74.     The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of DEFENDANTS' conduct, paid the claims.

75.     Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with DEFENDANTS' conduct. Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

76.     Had the State of California known that DEFENDANTS were violating the federal and state laws cited herein and/or that the claims submitted in connection with DEFENDANTS' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims.

77.     As a result of DEFENDANTS' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

78.     RELATORS are private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(C)) on behalf of themselves and the State of California.

79.     This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, RELATORS respectfully request this Court to award the following damages

to the following parties and against DEFENDANTS:

To the STATE OF CALIFORNIA:

(1)    Three times the amount of actual damages which the State of California has sustained as a result of DEFENDANTS' conduct;

(2)    A civil penalty of up to $10,000 for each false claim which DEFENDANTS presented or caused to be presented to the State of California;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATORS:

(1)    The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT IV
## FLORIDA FALSE CLAIMS ACT

80.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 51 above as if fully set forth herein.

81.    This is a *qui tam* action brought by RELATORS on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

82.    Fla. Stat. § 68.082(2) provides liability for any person who-

(a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

©) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed- or paid.

22

83.     DEFENDANTS violated Fla. Stat. § 68.082(2) and knowingly presented and/or caused hundreds of thousands of false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FDCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

84.     Also, upon information and belief, ROTECH falsely identified the compounded drugs on their Medicaid claims by using NDC numbers for brand name drugs. (Unlike Medicare, Medicaid requires identification of drugs by their NDCs).

85.     The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of DEFENDANTS' conduct, paid the claims.

86.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with DEFENDANTS' conduct. Compliance with applicable Florida statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Florida.

87.     Had the State of Florida known that DEFENDANTS were violating the federal and state laws cited herein and/or that the claims submitted in connection with DEFENDANTS' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information.

88.     As a result of DEFENDANTS' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

89.     RELATORS are private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on

23

behalf of themselves and the State of Florida.

90.     This Court is requested to accept pendent jurisdiction of this related state claim as it

is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to

the State of Florida in the operation of its Medicaid program.

WHEREFORE, RELATORS respectfully request this Court to award the following damages

to the following parties and against DEFENDANTS:


To the STATE OF FLORIDA:

  (1)     Three times the amount of actual damages which the State of Florida has
          sustained as a result of DEFENDANTS' conduct;
  (2)     A civil penalty of not less than $5,000 and not more than $10,000 for each
          false claim which DEFENDANTS caused to be presented to the State of
          Florida
  (3)     Prejudgment interest; and
  (4)     All costs incurred in bringing this action.


To RELATORS:

  (1)     The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any
          other applicable provision of law;
  (2)     Reimbursement for reasonable expenses which Relators incurred in
          connection with this action,
  (3)     An award of reasonable attorneys' fees and costs; and
  (4)     Such further relief as this Court deems equitable and just.


## COUNT V
## TEXAS FALSE CLAIMS ACT


91.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 51

above as if fully set forth herein.

92.     This is a *qui tam* action brought by RELATORS on behalf of the State of Texas to

recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

24

93.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who-

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

    (a) on an application for a contract, benefit, or payment under the Medicaid program; or

    (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program.

(2)    knowingly or intentionally concealing or failing to disclose an event:

    (a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of.

        (I)    the person, or

        (ii)    another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

    (b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

(4)    knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

    (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

94.    DEFENDANTS violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly made and caused hundreds of thousands of false claims to be made, used and presented to the State of Texas by its deliberate and systematic violation of federal and state laws, including the FDCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

95.    ROTECH may also have identified the compounded drugs on their Medicaid claims by using NDC numbers for brand name drugs. (Unlike Medicare, Medicaid requires identification

of drugs by their NDCs).

96.     The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of DEFENDANTS' conduct, paid the claims.

97.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with DEFENDANTS' conduct. Compliance with applicable Texas statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Texas.

98.     Had the State of Texas known that DEFENDANTS were violating the federal and state laws cited herein and/or that the claims submitted in connection with DEFENDANTS' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims.

99.     As a result of DEFENDANTS' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

100.    DEFENDANTS did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

101.    RELATORS are private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

102.    This Court is requested to accept pendent jurisdiction of this related state claim as it

26

is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, RELATORS respectfully request this Court to award the following damages to the following parties and against DEFENDANTS:

To the STATE OF TEXAS:

> (1)   Two times the amount of actual damages which the State of Texas has sustained as a result of DEFENDANTS' conduct;
> (2)   A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum.. Res. Code § 36.025(a)(3) for each false claim which DEFENDANTS cause to be presented to the state of Texas;
> (3)   Prejudgment interest; and
> (4)   All costs incurred in bringing this action.

To RELATORS:

> (1)   The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;
> (2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;
> (3)   An award of reasonable attorneys' fees and costs; and
> (4)   Such further relief as this Court deems equitable and just.

## COUNT VI
## MASSACHUSETTS FALSE CLAIMS ACT

103.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 51 above as if fully set forth herein.

104.   This is a *qui tam* action brought by RELATORS on behalf of the State of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 § 5(A) *et seq.*

105.   Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who-

> (1)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

27

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or

(3)    conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(9)    is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

106.    DEFENDANTS violated Mass. Gen. Laws Ann. Chap. 12 § 5B and knowingly presented and caused hundreds of thousands of false claims to be made, used and presented to the State of Massachusetts by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Mass. Gen. Law Ann. Chap. 118E § 41 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

107.    ROTECH may also have identified the compounded drugs on their Medicaid claims by using NDC numbers for brand name drugs. (Unlike Medicare, Medicaid requires identification of drugs by their NDCs).

108.    The State of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of DEFENDANTS' conduct, paid the claims.

109.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief: also an express condition of payment of claims submitted to the State of Massachusetts in connection with DEFENDANTS' conduct. Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Massachusetts.

110.    Had the State of Massachusetts known that DEFENDANTS were violating the federal

and state laws cited herein and/or that the claims submitted in connection with DEFENDANTS' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims.

111.   As a result of DEFENDANTS' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the State of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

112.   RELATORS are private citizens with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5(c)(2) on behalf of themselves and the State of Massachusetts.

113.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Massachusetts in the operation of its Medicaid program.

WHEREFORE, RELATORS respectfully request this Court to award the following damages to the following parties and against DEFENDANTS:

To the STATE OF MASSACHUSETTS:

(1)   Three times the amount of actual damages which the State of Massachusetts has sustained as a result of DEFENDANTS' conduct;
(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which DEFENDANTS caused to be presented to the State of Massachusetts;
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action.

To RELATORS:

(1)   The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12, §5F and/or any other applicable provision of law;
(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)   An award of reasonable attorneys' fees and costs; and
(4)   Such further relief as this Court deems equitable and just.

29

DATED this 2⁰ day of September, 2006.

Respectfully submitted,

NOLAN LAW FIRM

By: _____

Marcella Auerbach
Fla. Bar No.: 249335
Kenneth J. Nolan, Esq.
Fla. Bar No.: 603406
Trial Counsel for Relators
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937